UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                              )
Emily St. Clair,                                              )
          Plaintiff                                           )
                                                              )
          v.                                                  )
                                                              )
BERKSHIRE COUNTY SHERIFF'S DEPARTMENT,                        )
Sheriff Thomas Bowler, in his official and individual         )
capacity,                                                     )
                                                              )
          Defendants                                          )
_____)


_____

COMPLAINT AND JURY DEMAND
_____

## INTRODUCTION

In this action the Plaintiff Emily St. Clair ("Plaintiff" or "Ms. St. Clair") seeks redress based on the unlawful discrimination by her employer, the Berkshire Country Sherriff's Office, and its employees on the basis of gender, pregnancy, pregnancy related medical conditions by an employer against its employee, and for unlawful retaliation. The Plaintiff alleges that the unlawful discrimination by the Defendant employer against the Plaintiff violated the Civil Rights Act, 42 U.S.C. 2000e, et seq., as amended by the Pregnancy Discrimination Act of 1978. The Plaintiff further alleges claims for violation of the Massachusetts Healthcare Provider Whistleblower Act M.G.L. c. 149, §187, the Massachusetts Declaration of Rights, Massachusetts Discrimination Law M.G.L. c 151B, §4, as well as violations of the common law.

## VENUE

1. This action properly lies in the District of Massachusetts, pursuant to 29 USC §1391(b), because the claim arose in this judicial district, and pursuant to 42 USC §2000e-5(f) (3), because the unlawful employment practice(s) were committed in this judicial district.

## ADMINISTRATIVE PREREQUISITES

2. On or about December 6, 2019, the Plaintiff filed a Charge of Discrimination at the Massachusetts Commission Against Discrimination, MCAD Docket Number 19SEM03416, charging the Defendants with discriminating against the Plaintiff in employment on the basis of gender and pregnancy status.

3. The Charge of Discrimination was filed jointly with the Massachusetts Commission Against

Discrimination and Equal Employment Opportunity Commission, EEOC No: 16C-2020-00427, within the time required by Massachusetts General Laws Chapter 151B.

4. Plaintiff has withdrawn her Charge of Discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission.

## PARTIES

5. The Plaintiff, Emily St. Clair, is an individual residing in Berkshire County, Commonwealth of Massachusetts.

6. The Defendant, Berkshire County Sheriff's Department, is located in Berkshire County, Commonwealth of Massachusetts.

7. The Defendant, Thomas Bowler, is Sheriff of the Berkshire County Sheriff's Department, with a place of business located in Berkshire County, Commonwealth of Massachusetts.

## STATEMENT OF FACTS

8. Plaintiff, Emily St. Clair (Hereinafter "Ms. St. Clair" or "Plaintiff"), age 31, has been a nurse for over five years.

9. From April 2017 to May 2019, Ms. St. Clair was employed as a Registered Nurse (RN) for Defendant Berkshire County Office of Sheriff (Hereinafter "the Sheriff's Office").

10. At all relevant times, the Sheriff's Office employed six or more individuals, and as such is an employer under M.G.L. c. 151B.

11. At all relevant times, the Sheriff's Office employed fifteen or more individuals, and as such is an employer subjected to the provisions of the Pregnancy Disability Act, 42 U.S.C. §2000e(k).

12. Plaintiff was stationed on the medical team at the Berkshire County House of Corrections (Hereinafter "BCHC").

13. Ms. St. Clair began working for the Sheriff's Office at the BCHC on April 11, 2017.

14. Prior to working at the BCHC, Ms. St. Clair was employed at Hampden County Women's Correctional Facility in Chicopee, MA from November 2015 until April 2017. There, Plaintiff had a work-history free of discipline and was always in good standing.

15. Upon being hired by the Sheriff's Office in April 2017, the Plaintiff was placed on probationary employment status for one (1) year.

16. While employed by the Defendant, the Plaintiff adjusted well to her new position; she was a hard worker and performed all of her duties energetically and professionally.

2

17. However, over the course of her two years of employment at BCHC, Plaintiff reported what she reasonably believed to be a number of unsafe working conditions and practices to her supervisors within the jail. The Plaintiff's objections to these unsafe working conditions were not well received by the Defendants, who viewed her as overly concerned about safety within the confines of the institution. Some of the medical safety issues the Plaintiff objected to the Defendants about included the following:

   a. For a period of approximately four to six months prior to her termination, nurses employed by the BCHS were using "Nitrile" gloves on a daily basis while dealing with inmates and performing other medical related responsibilities.  The Plaintiff objected to the use of nitrile gloves which were not designated for medical usage. In fact, the box they were contained in designated that the gloves were "food grade safe, not intended for medical use." Ms. St. Clair objected to, and reported this safety issue to her supervisor, Lisa St. John and others in a supervisory capacity.

   b. Plaintiff forcefully objected to the Defendants regarding their ongoing practice of bringing syringes into the various "pods" or units where inmates were housed to provide insulin or immunizations by injection. This practice created an unsafe potential for the use of the syringes as a weapon as well as a health hazard. The Plaintiff stated that an inmate could inject themselves with insulin quickly and then use the syringe to cause harm to themselves or to the nurse or others nearby. She explained that in her previous employment at a female facility in Chicopee, all inmates were brought to the medical department, which was a controlled environment for the purpose of administering injections. Her complaints about this practice were never addressed by the Defendants and continues to this day.

   c. On a separate occasion, a correction officer left the Plaintiff and a fellow employee alone in a cell with two inmates without supervision or protection. The Plaintiff was upset by this event and expressed her concern for her personal safety and her objections to this to her immediate supervisor. No corrective action was taken by the Defendants.

   d. The Plaintiff also objected to the manner and structure of what she considered to be an unsafe set-up of the medical intake room. All of the inmates seeking medical attention at the BCHC were brought into a relatively small intake room where they were evaluated by the medical staff. The Defendants had for years arranged a "set up" where the attending nurse was positioned in the corner of the room while the inmate was positioned closest to the door. This scenario created the risk that the nurse would not have immediate access to escape an assault by an inmate.

   e. Despite her objections to this arrangement, no changes were made by the Defendants to alter the intake room layout. As a result of her concerns, the

Plaintiff would leave the door unlocked and slightly cracked open so that she could call for and receive assistance from the officers if necessary.

f.  On multiple occasions an officer would close the door while Plaintiff was alone with an inmate, causing Ms. St. Clair to feel unsafe and again voice her objections and concerns to this arrangement.

18. These various complaints about safety issues resulted in the Plaintiff being viewed in a negative light by the Defendants who considered her to be a source of aggravation and overly concerned with patient/inmate safety issues. They also resulted in acts of retaliation against the Plaintiff as further described below.

19. On December 1, 2017, Ms. St. Clair was engaged in conversation with an inmate about his medical status and related paperwork. During this encounter, the inmate began making derogatory comments about the BCHC medical department.

20. The inmate specifically targeted Physician Assistant Jeffrey Kellogg ("Kellogg"), at which point a second inmate approached the Plaintiff from behind and also began to complain about the medical care he was receiving and also made derogatory remarks about PA Kellogg.

21. The Plaintiff was in fear for her safety with an inmate directly in front of her and another behind her. She attempted to handle this confrontation by telling the second inmate to "mind his own business and go away."

22. During this situation, a supervising correction officer, Officer Austin Worth ("Worth"), was present, but failed to intervene or come to the assistance of the Plaintiff.

23. During this incident, the Plaintiff made reference to one of the inmates' criminal records in an effort to end the verbal assault.

24. Shortly after she voiced her concerns about this incident, on December 5, 2017, Ms. St. Clair was issued a written reprimand from the Defendant for her actions that day.

25. Although the written reprimand given to the Plaintiff noted, "the fact that the officer supervising the pod did not exert proper control of the situation," Corrections Officer Worth did not receive any form of discipline or reprimand for his failure to act to intervene and protect the Plaintiff.

26. The Plaintiff's supervisor at the time was the Director of Nursing, Lisa St. John ("St. John"), who wrote a letter to the Board of Nursing, describing Plaintiff as follows:

"Emily is a very consciousness [sic] and professional nurse. She carries out her expected duties with accuracy and timeliness and follows the policies and procedures of our facility and adheres to the standards . . . She is a very reliable employee and is a valuable member of our medical team."

27. Aside from the December 2017 incident referenced above, there were no disciplinary issues and the Plaintiff remained a successfully performing employee until March 2019 when she first announced her pregnancy to members of the Berkshire County Sheriff's Office.

28. Specifically, on March 13, 2019, the Plaintiff told her supervisor Lisa St. John that she was pregnant.

29. In an attempt to justify the Plaintiff's termination, the Defendant claimed in their Answer to the Plaintiff's MCAD complaint that the Plaintiff was periodically "late" for work. According to the Defendants, "The Complainant was late to work three times in her first two months of working for the Respondent."

30. The Plaintiff was not "late" for work. Although the Plaintiff's shift began at 3:00 PM, the Defendant required the Plaintiff to "clock-in" at 2:48 PM, twelve minutes before the commencement of her shift. The Defendant's alleged tardiness ("three times in the first two months of working for the Respondent") was based upon her purportedly not "clocking-in" before 2:48 PM.

31. The Plaintiff was never disciplined or "written up" by the Defendant for any alleged tardiness. Nor did the Plaintiff have any "performance" related issues as a nurse prior to announcing her pregnancy to the Defendants.

32. The announcement of the Plaintiff's pregnancy was not well received by those in management when they were informed of her pregnancy. To the contrary, there were no congratulations offered or inquiries made regarding the expected due date for the birth of the Plaintiff's baby.

33. It is important to state that at the time of announcing her pregnancy, the Defendant BCHC had no formal written maternity policy for its female employees.

34. The Plaintiff is aware, upon information and belief, there was only one other woman within the employ of the Defendant who had become pregnant while working for the Defendant BCSO in the past five (5) years.

35. Shortly after announcing her pregnancy, the Plaintiff's supervisor, Lisa St. John informed Assistant Superintendent Daniel Sheridan ("Sheridan"), the Sheriff's Assistant Diane Maynes, and Health Administrator Nancy Pieraccini ("Pieraccini") that Plaintiff was pregnant.

36. The Plaintiff was one (1) months pregnant at the time she informed her supervisor of her pregnancy.

37. After announcing her pregnancy on March 13, 2019, the Plaintiff informed management that this was her first pregnancy, that she was tiring during the latter portion of her shift which began at 3:00 PM and ended at 11:00 PM. As a consequence, the Plaintiff requested an accommodation from the Defendants in the form of a change in the start time of her shift.

The Plaintiff simply requested her supervisors to permit her to take the open position on the first shift, which began at 7:00 AM.

38. It is important to note that no one from the employ of the Defendant provided any notice, formally or informally to the Plaintiff of her rights to a reasonable accommodation under the Federal Pregnant Workers Fairness Act. The Pregnant Workers Fairness Act requires that written notice be given to the employee of her rights within ten (10) days after notice is given of her pregnancy.

39. A few days after requesting this accommodation, Defendant Pieraccini told Plaintiff, in the presence of Ms. St. John, that the Plaintiff would not be permitted to change to the first shift because the change to another shift would purportedly require the Defendants to hire another registered nurse.

40. Despite the Defendants' statutory requirement to do so, there was also no good faith "interactive process" provided by the Defendants to the Plaintiff. There was no discussion about any undue hardship to the Defendant, the employers' financial resources, the nature and cost of the accommodation requested by the Plaintiff, or other alternatives available to the Plaintiff.

41. Within a week of announcing her pregnancy on March 13th and requesting a change of shifts, the Plaintiff began to become the target of unwarranted criticism and investigation by the Defendants.

42. In footnote 4 of their Answer to the Plaintiff's MCAD complaint, the Defendants falsely claim that the Plaintiff was suspended from her employment on March 29, **2018**, when in fact the discipline was imposed by the Defendants on March 29, **2019**, only sixteen (16) days after the Plaintiff had announced her pregnancy to her supervisors.

43. The purpose of this misstatement by the Defendants in footnote 4 of their answer to the MCAD was 1). to create the impression that the Plaintiff had an ongoing prior disciplinary history, including the so-called "tardiness/late" contention, and 2). to mitigate the temporal proximity between the announcement of Plaintiff's pregnancy on the 13th of March, her request for an accommodation on the 16th of March, and the Defendants denial three days later and then their imposition of discipline on March 29th.

44. The purported basis for taking disciplinary action against the Plaintiff occurred on March 20, 2019.

45. On that date, the Plaintiff was one of *three* nurses working on the second shift. Three nurses and two medical assistants had also previously worked the first shift that same day. Their shift ended at 3:00 PM.

46. During the first shift on March 20th, an inmate had arrived for intake and was kept in the booking area for a period of time until one of the three (3) first shift nurses could complete his medical intake. The inmate had arrived at approximately 1:30 PM, however, for unknown

reasons, none of the three (3) nurses assigned to the first shift ever completed his medical intake in the intervening two hours.

47. Upon arriving for her shift shortly before 3:00 PM, the Plaintiff followed her usual daily routine; she reviewed the crisis log, sheriff's report and emails, and performed her daily tasks.

48. It was routine for nurses employed by the Defendant to wait for a Correction Officer from the booking area to call and inform the nurses that the inmate was ready to be seen before reporting to the area.

49. At approximately 3:20 PM, Officer Marisa Salice-Rivera ("Salice-Rivera") called the nurses' office to request medical clearance for the inmate waiting for intake in the booking area. Salice-Rivera did not speak with the Plaintiff at this time, nor was Plaintiff's supervisor, Ms. St. Clair informed that the call had been made by Officer Salice-Rivera.

50. At approximately 3:50 p.m., Officer Salice-Rivera called the nurses' office to report that a second inmate had returned from the hospital and inquired whether anyone on the medical staff wanted to see him before he was returned to his housing unit.

51. This second conversation was between Officer Salice-Rivera and Licensed Practical Nurse (LPN) Kayla Robinson ("Robinson").

52. During this phone call, Officer Salice-Rivera informed nurse Robinson, not the Plaintiff, that the first inmate had been waiting for his medical intake since 1:30 p.m.

53. After this phone call, the three nurses on duty went to the medication room to prepare their carts for the nightly medication pass and collect the necessary supplies for the medical intakes.

54. While the three nurses were preparing for their duties, Captain Peter DiGrigoli ("DiGrigoli") entered the medication room and asked why the first inmate was still waiting for his medical intake. DiGrigoli directed his comments solely to the Plaintiff and then stated that he was going to e-mail the Plaintiff's supervisor, Ms. St. John about the delay in intake.

55. Plaintiff told Captain DiGrigoli that she was on her way to the booking area for the intake of the inmate; she showed him that she had the necessary supplies in her hands.

56. When Plaintiff entered the booking area there were four correction officers sitting at the officer's station.

57. Ms. St. Clair asked if someone had complained to Captain DiGrigoli about the waiting inmate because DiGrigoli had confronted the nurses about the delay and was going to send their supervisor an e-mail, even though Plaintiff was about to conduct the intake.

58. Plaintiff expressed her concern to the officers about getting in trouble for the situation despite the fact that the nurses had not done anything wrong.

59. Officer Salice-Rivera stated to the Plaintiff that the inmate had been waiting for an extended period of time. The Plaintiff explained that the majority of that time was due to the first shift's failure to conduct a timely intake between his arrival at 1:30 PM and the end of the first shift at 3:00 PM.

60. More than a week later, on March 28, 2019, the Plaintiff was interrogated by three men, Director of Security Michael Huggins ("Huggins"), Assistant Superintendent Brad Little ("Little"), and Paul Sheridan, who were "investigating" the situation.

61. The Plaintiff was unrepresented during this interrogation and her supervisor, Lisa St. John, who was on vacation, was never interviewed regarding the timing of this incident or the respective duties of the various nurses assigned to each shift.

62. During the questioning, Plaintiff learned for the first time that officers had submitted reports claiming that the Plaintiff had referred to them as "rats."

63. When the Plaintiff defended herself and denied referring to anyone as a "rat," Director of Security Huggins became angry and aggressively stated to the Plaintiff, "So are you saying my officers are liars?"

64. During the interrogation all three men were informed that the Plaintiff was pregnant. In response, Director Huggins sarcastically replied, "Yeah, and I have a one-year old son."

65. During the interview, Mr. Sheridan told the Plaintiff that she "act[s] like a mini boss," and that she "flaunt[s] [her] credentials." Mr. Sheridan also told the Plaintiff that he was "sick of hearing about Chicopee, why don't you just go back there."

66. The Plaintiff began to cry during this interview and kept her head down for the remainder of the questioning, afraid to respond further in fear that any response would further anger the three men.

67. That evening the Plaintiff stayed to work the night shift, but left early because she was extremely emotional and physically "shaken up" from the interrogation.

68. The stress and emotional impact from this interrogation continued into the next day, causing the Plaintiff to call out sick on Friday, March 29, 2019. The Plaintiff was scheduled to return to work on April 2 following her scheduled weekend off (from March 30 to April 1).

69. On the same day of the interview, Huggins, Little, and Sheridan issued the Plaintiff a disciplinary letter imposing a three-day, unpaid suspension (from April 2 through April 4, 2019) based upon her alleged misconduct. The Plaintiff learned of her suspension from a telephone call with Mr. Sheridan on April 1.

70. When the Plaintiff returned from her suspension, on April 5, Sheridan, Little, and Huggins gave the Plaintiff her disciplinary letter dated March 28, 2019.

71. Plaintiff's disciplinary letter wrongfully portrayed the Plaintiff as the only nurse available at the time of this incident and held her solely responsible for the medical intake of inmates on that day.

72. There were at least five (5) other nurses on the first and second shifts that day. All of whom were equally available and capable of performing the necessary medical intake of the inmate in question, but only the Plaintiff was singled out and disciplined for this incident.

73. Notably, NCCHC (National Commission on Correctional Health Care) standards allow up to four hours to pass before the medical intake of an inmate is required. The inmate in question had been waiting approximately two and a half hours.

74. Upon her return to work, the Plaintiff told Sheridan, Little, and Huggins that she did not agree with multiple parts of the disciplinary letter, to which they responded she could write a rebuttal.

75. On May 2, 2019, the Plaintiff was shadowed by a potential new hire, Sierra Leveque ("Leveque").

76. The Plaintiff showed Ms. Leveque her daily routine, explained her various responsibilities and gave Ms. Leveque a tour of the medical rooms.

77. While waiting for intake calls, the Plaintiff, Ms. Leveque, and LN Robinson were conversing in the nurse's station.

78. When asked about the working conditions at BCJC, both of the nurses (the Plaintiff and Robinson) stated to Ms. Leveque that there were occasions when the medical staff were treated with less regard than the corrections officers. The Plaintiff stated her belief that she was suspended for something she did not do,(referring to the March 20 incident). At the same time, nurse Robinson also stated her concern that she does not receive support from officers when she goes into pods with the inmates. Ms. Leveque even contributed, saying that she had been a student nurse for a former BCHC employee, and the former employee warned her about working at BCHC. Ms. Leveque also stated that her husband did not want her working at the facility because he had concerns about the environment.

79. Six days later, on May 8, 2019, Sheridan and Little again interrogated the Plaintiff about the conversation between the three women on May 2. The two men stated that Ms. Leveque purportedly did not want to work at BCHC, ostensibly because of what Plaintiff (not nurse Robinson) had said during the conversation.

80. The Plaintiff related the substance of the conversation between the three women at the nurses' station. However, the men responded with their own version of the events, stating that Plaintiff's explanation "did not matter." Mr. Sheridan repeatedly disputed what the Plaintiff had said, even though he was not present for the conversation.

81. At the end of the questioning, Ms. St. Clair was told to take the night off because of "how 'emotional' [she gets] after interviews."

82. The Plaintiff was suspended May 9, pending further investigation of the May 2 events.

83. After this interview, Ms. Pieraccini falsely told other employees that the Plaintiff was "emotional" and "fighting" with Mr. Sheridan during her interrogation. She also falsely stated that the Plaintiff "kicked" the door when she left the building.

84. Based upon information and belief nurse Robinson was not interviewed or disciplined as part of the investigation, despite her involvement in the conversation on May 2.

85. Ms. Leveque was questioned even though she was not an employee.

86. On May 10, 2019, exactly two months after Ms. St. Clair announced her pregnancy, Mr. Sheridan called Plaintiff, informing her that he had spoken with the Defendant, Sheriff Thomas Bowler ("Bowler"), who made the decision to terminate her employment.

87. During the phone conversation Mr. Sheridan stated that he could not provide the Plaintiff with a reason justifying Plaintiff's termination. Instead, Mr. Sheridan raised the incident of December 2017 despite the incident occurring nearly two years prior as the reason for her termination.

88. Mr. Sheridan also told the Plaintiff that she would still have health insurance coverage through the month of June. Unbeknownst to the Plaintiff, her health insurance was cancelled on May 31, 2019.

89. As a result of the cancellation of her health insurance, the Defendants effectively deprived Ms. St. Clair of the opportunity to secure alternative health insurance during this critical time period of her pregnancy. As a consequence of the termination of the Plaintiff's medical insurance, she was required to secure medical coverage from MassHealth, who provided access to a midwife.

90. Under MassHealth, the Plaintiff was given access to a limited number of providers who were not specialists familiar with a serious medical condition she suffered relating to her pregnancy. As a consequence of the lack of medical insurance and care, the Plaintiff underwent an emergency C-section and seven (7) hours of surgery, which ultimately required a partial hysterectomy.

91. The morning she was notified of her termination, the Plaintiff called the BCHC, requesting to meet with Sheriff Bowler. Sheriff Bowler's assistant, Diane Maynes, did not return Plaintiff's call until May 13, 2019 and told the Plaintiff that there no need for any further discussion.

92. Despite claiming that Ms. Levesque did not want to work at the BCHC, purportedly because of the Plaintiff's comments, Ms. Leveque was hired to replace the Plaintiff on May 10, 2019, the day after the Plaintiff was terminated.

93. Notably, when the Plaintiff announced her pregnancy and requested an accommodation to work on the first shift, Ms. Pieraccini stated that the Defendants would not do so because an individual would have to be hired with the same credentials as Plaintiff in order to replace her on the second shift.

94. Shortly after the Plaintiff's termination, two more nurses, in addition to Ms. Leveque, were hired by the Defendant.

100. At the time of her hire, Ms. Leveque had not yet passed nursing school or passed her nursing board examination.

101. While at BCHC, the Plaintiff was frequently praised by her supervisor, Lisa St. John stating that when she (St. John) retired she wanted the Plaintiff to take her position.

102. One inmate praised the Plaintiff in a note to Ms. St. John on June 19, 2018, stating:

> "I'd like to comend [sic]/thank your nurse Emily for taking my recent medical condition serious even if I didn't. They said at the hospital that she may have saved my life. She is a definet [sic] asset to your team. And I hope her handeling [sic] of this matter reflects favorably at her next Review as she deserves it. Thank you."

103. Based upon the foregoing, the Defendants, jointly and severally, unfairly discriminated against the Plaintiff due to her pregnancy, in addition to other violations of Federal and State law.

104. Upon learning of her pregnancy, Defendants failed to comply with the the Americans with Disabilities Act (ADA), Pregnancy Disability Act (PDA) as well as the Pregnant Workers Fairness Act and in doing so, unreasonably denied the Plaintiff the opportunity to change shifts, thereby interfering with her right to fair and equal access to job assignments.

105. Defendants also subjected the Plaintiff to unequal disciplinary action and failed to provide uniform disciplinary sanctions with regard to their own Rules and Regulations of progressive discipline.

106. Defendants intentionally conducted investigations and interrogations unfairly targeting Plaintiff in an effort to wrongfully terminate her employment and avoid the requirements of the ADA and Pregnant Workers Fairness Act.

107.    These investigations and subsequent discipline were pretextual; they were poorly
        executed – intentionally – to portray Plaintiff in a negative light as a pretext to her
        termination.

108.    Defendants terminated the Plaintiff at the time of her pregnancy in order to employ Ms.
        Leveque at a lower pay grade and in an effort to avoid their responsibilities under the
        Pregnancy Disability Act and the Pregnant Workers Fairness Act.

110.    This environment and the conditions imposed upon the Plaintiff related to and adversely
        affected the terms and conditions of her employment.

111.    The Plaintiff was severely and adversely affected by the Defendant's conduct and the
        failure of the Defendant to take reasonable steps to ensure that this discriminatory
        conduct would not continue.

112.    Based upon the foregoing, the Defendants, jointly and severally, also retaliated against
        the Plaintiff for her objections to what she reasonable believed to be unsafe and improper
        medical procedures and practices used by the Defendants which were illegal, unethical or
        otherwise created the risk of harm to the public.


## COUNT I
## SEX & PREGNANCY DISCRIMINATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 & THE PREGNANCY
## DISCRIMINATION ACT OF 1978

113.    Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this
        Complaint as if set forth in full herein.

114.    Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for
        an employer . . . to discriminate against any individual with respect to his compensation,
        terms, conditions, or privileges of employment, because of such individual's . . . sex." 42
        U.S.C. § 2000-e2(a).

115.    Said Act defines "because of sex" as including "because of or on the basis of pregnancy,
        childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

116.    At all times material hereto, Defendant met the definition of an "employer" as defined by
        Title VII. 42 U.S.C. § 2000e(b).

117.    At all times material hereto, Plaintiff is a member of a protected class on the basis of her
        sex, female, and pregnancy.

118.    At all times material hereto, Plaintiff was and is qualified to be a Registered Nurse (RN)
        for Defendant Berkshire County Office of Sheriff

119.    Plaintiff suffered an adverse employment action by Defendant.

120.    Plaintiff suffered the above adverse employment actions under circumstances that give
        rise to an inference of sex discrimination.

121.    A nexus exists between Plaintiff's pregnancy and the adverse action.

122.    That Defendant's proffered reasons, to the extent that they are nondiscriminatory, are
        wholly pretextual in nature

123.    That Defendant's actions constitute sex and pregnancy discrimination in violation of Title
        VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act of 1978.

124.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered
        and will continue to suffer severe economic damages, including, but not limited to, lost
        wages, back pay, front pay, raises, bonuses, health, dental, vision, and life insurance
        benefits, pension and/or retirement benefits, investment opportunities, employer
        contributions, and any other compensation and fringe benefits provided by Defendant
        along with an additional amount to offset any negative tax consequences of recovery.

125.    That as a direct and proximate result of Defendant's unlawful actions, Plaintiff has
        suffered and will continue to suffer from severe non-economic damages, including, but
        not limited to, emotional distress, mental anguish, shock, fright, humiliation,
        embarrassment, nervousness, anxiety, depression, disruption of lifestyle, and denial of
        social pleasures.

126.    Plaintiff hereby claims compensatory and punitive damages pursuant to 42 U.S.C. §
        1981a.

127.    That Plaintiff hereby claims the costs of this action and reasonable attorney and expert
        witness fees pursuant to 42 U.S.C. § 2000e-5(k).

<u>**COUNT II**</u>
**Violation of G.L. c. 151B, § 4 Gender Discrimination-Pregnancy and Childbirth**

128.    Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this
        Complaint as if set forth in full herein.

129.    It is unlawful under <u>G.L. c. 151B, § 4</u> for an employer to take an adverse action against
        an employee on the basis of sex.

130.    Pregnancy and childbirth are sex-linked characteristics, and any actions of an employer
        that adversely impact an individual because of her pregnancy, childbirth, maternity leave,
        or related medical conditions constitute sex discrimination under <u>G.L. c. 151B, § 4</u>.

13

131.    Here, Defendant violated G.L. c. 151B by terminating Plaintiff's employment for reasons related to her pregnancy, childbirth, maternity leave, or related medical conditions.

132.    Defendant harmed, injured and damaged Plaintiff by its violation of G.L. c. 151B.

## COUNT III
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

133.    Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

134.    There existed an implied covenant of good faith and fair dealing, which Defendant breached in its dealings with Plaintiff. Upon learning of her pregnancy, Defendants unreasonably denied the Plaintiff a reasonable accommodation and the opportunity to change shifts, thereby interfering with her right to fair and equal access to job assignments. Defendants also subjected Ms. St. Clair to unequal disciplinary action.

135.    The above acts and practices of Defendant, as more fully set forth herein, constitute a breach of the implied covenant of good faith and fair dealing.

136.    As a result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiff has suffered loss of substantial income, loss of valuable employee benefits, loss of personal and professional opportunities, loss of business reputation, emotional distress, attorney's fees and costs and other compensatory damages.

## COUNT IV
## HOSTILE WORK ENVIRONMENT

137.    Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

138.    Defendant's conduct created a hostile working environment that affected Plaintiff's terms and conditions of employment.

139.    Moreover, Defendant's behavior was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and created an abusive working environment.

## COUNT V
## VIOLATION OF ARTICLE X OF THE MASSACHUSETTS
## DECLARATION OF RIGHTS

140.    Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

141.    Article X of the Massachusetts Declaration of Rights provides that no citizen may be deprived of the enjoyment of his or her property without due process of law.

142.    Plaintiff possessed a property interest in her continued employment.  By depriving Plaintiff of her position without cause and without due process of law, defendants violated Article 10 of the Massachusetts Declaration of Rights.

143.    As a consequence of the defendants' actions, Plaintiff suffered and continues to suffer damages, including but not limited to: loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

v. Defendant Sheriff   Thomas Bowler, in his official and individual capacity, Assistant Superintendent Daniel Sheridan, in his official and individual capacity, Assistant Superintendent Brad Little, in his official and individual capacity, Health Administrator Nancy Pieraccini, in her official and Individual capacity, and Director of Security Michael Huggins, in his official and individual capacity

144.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

145.    Defendant's conduct of discriminating against plaintiff and retaliating against her was extreme and outrageous.

146.    A reasonable and prudent person in the same or similar circumstances as defendants would know or should have known that plaintiff's emotional distress was a foreseeable result of this extreme and outrageous conduct.

147.    As a result of the above-described actions, Plaintiff was caused to suffer emotional injuries and damages.

## COUNT VII
## RETALIATION IN VIOLATION OF THE HEALTHCARE PROVIDER WHISTLEBLOWER STATUTE, G.L.c.149 § 187

148.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

149.    At all times relevant herein, Defendant were/are "Health Care Facilities," as that term is defined by this statute.

150.     At all times relevant herein, Plaintiff was/is a "Health Care Provider," as that term is defined by this statute.

151.    Through their above conduct, Defendants retaliated against Plaintiff for engaging in conduct set forth in sub-part (b) of this statute.

## COUNT VIII

**FAILURE TO ACCOMMODATE UNDER 42 U.S.C. 12101 ET SEQ**

152.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

153.    Defendants failed to reasonably accommodate Plaintiff's disability, failed to engage in an interactive process to properly and reasonably address her pregnancy/health concerns, and as a result she was subject to adverse employment actions by means of Defendants discriminatory conduct and other retaliatory and unfair treatment.

154.    Defendant's conduct constitutes unlawful disability discrimination, in violation of the Americans with Disabilities Act, 42 U.S.C. 12101, et seq.

155.    As a direct and proximate result of Defendants' unlawful disability discrimination, in violation of the Americans with Disabilities Act, 42 U.S.C. 12101, et seq., Plaintiff has incurred and continues to incur substantial loss of wages, earning capacity and fringe benefits, has suffered emotional distress and anguish of mind, and has suffered, and will continue to suffer, other damages as he will show at trial.

156.    Plaintiff complied with the requirement(s) of 42 U.S.C. 12101, et seq. and 42 U.S.C. 2000e-5(e)(1) when she properly and in a timely manner filed a complaint with the Massachusetts Commission Against Discrimination, said Complaint which was cross-filed with the Equal Employment Opportunities Commission, alleging that the defendant terminated her employment because and on account of her disability and otherwise subjected her to unlawful disability discrimination.

## COUNT IX
## FAILURE TO ACCOMMODATE UNDER 42 U.S.C. 12101 ET SEQ DISCRIMINATION BASED ON PLAINTIFF "REGARDED AS" DISABLED

157.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

158.    Plaintiff is disabled within the meaning of the ADA, 42 U.S.C. § 12102(2), insofar as she has an impairment that substantially limits one or more major life activities, has a record of such an impairment, or was regarded by Defendants as having such an impairment.

159.    Defendants intentionally and wrongfully discriminated against Plaintiff on the basis of being "regarded as" disabled in violation of the ADA when it constructively discharged and/or terminated Plaintiff because of her disability.

## COUNT X
## VIOLATION OF THE MASSACHUSETTS PREGNANT WORKERS FAIRNESS ACT UNDER M.G.L. c. 151B

160.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

161.    The Pregnant Workers Fairness Act prohibits employment discrimination on the basis of pregnancy and pregnancy-related conditions.

162.    Plaintiff was pregnant during her employment with Defendant.

163.    Plaintiff requested accommodations from Defendant, including accommodations to her work schedule.

164.    As a result of the Defendant's actions, Plaintiff has suffered damages.

THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,
For Plaintiff,
By her attorney,

 /s/ Timothy M. Burke, Esq.
Timothy M. Burke, BBO #065720
160 Gould Street, Suite 100
Needham, MA 02494-2300
Dated: September 4, 2020            (781) 455-0707

**CERTIFICATE OF SERVICE**

I, Timothy M. Burke, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 4, 2020.

/s/ Timothy M. Burke, Esq.